Fred A. Britten and Peter F. Reynolds, Defendants in Error, v. B. J. Fitzgerald, Plaintiff in Error.

## Gen. No. 15,602.

MUNICIPAL COURT—*when judgment set aside with final judgment.* If the evidence clearly establishes no liability upon the part of the defendant the Appellate Court will reverse the judgment rendered and enter a final judgment of *nil capiat.*

Error to the Municipal Court of Chicago; the Hon. JOSEPH Z. UHLIR, Judge, presiding. Heard in this court at the October term, 1909. Reversed and judgment here. Opinion filed June 1, 1911.

MASON BROTHERS, for plaintiff in error.

FRANK JOHNSTON, JR., for defendants in error.

MR. JUSTICE BROWN delivered the opinion of the court.

This is a writ of error to reverse a judgment for $657.69, rendered on March 27, 1909, by the Municipal Court of Chicago, sitting without a jury, against the defendant Fitzgerald and in favor of the plaintiffs Britten and Reynolds.

The "Statement of Claim" on which the suit was founded represents said claim to be "for taxes for the years 1906-7, on certain described lots and improvements thereon, known as No. 1225 Washington Boulevard, Chicago, which the defendants agreed to pay, and for the costs and expenses of redeeming said property from a tax sale for said years by reason of the failure of the defendants to pay taxes thereon."

There was evidence in the cause tending to prove, and sufficient for the court to base a finding on, that in a transaction involving the exchange of real estate between Fitz-

gerald on the one side and Britten and Reynolds on the other, in the early part of 1907, and incidental thereto the payment of a large sum of money by said Britten & Reynolds to Fitzgerald, there was included in the computation of that sum and in the check given therefor, $278.65 for the unpaid taxes of 1906 on one of the pieces of property exchanged (1225 Washington Boulevard), and that Fitzgerald assured Britten & Reynolds that he would pay that sum to the County Clerk for those taxes on or before May 1, 1907.

The evidence also showed that Fitzgerald did not pay the said sum for taxes then or at any other time, and that he did not refund the money in cash to Britten & Reynolds. It also appears in the evidence that Britten & Reynolds afterwards (in December, 1908) came into possession of the said property by a quit claim deed from a third party, and that in order to clear the same from the lien of the taxes for 1906, for which it had been sold in September, 1907, Britten & Reynolds were obliged to pay under the statute (section 210 of the Revenue Act as amended by Act of June 26, 1895) the following sums:

| | |
|---|---:|
| Amount of sale | $293.52 |
| Penalty on amount of sale at 9 per cent | 26.42 |
| Subsequent taxes of 1907 | 314.11 |
| Interest | 21.99 |
| Advertising, Redemption, Certificate, Filing and Cancellation and noting Tax Sale on Collector's Warrant | 1.65 |
| Total, | $657.69 |

Evidently on the theory that as this whole amount of $657.69 had to be paid by Britten & Reynolds in order to remove the lien of the taxes for 1906, which to the amount at which they stood on May 1, 1907, viz., $278.65, Fitzgerald had agreed on good consideration to pay, the measure of damages for the breach of the contract was this whole

amount,—the court fixed those damages and its judgment at $657.69.

We do not think that this was justified in any view taken of the case. The plaintiffs expressly disclaimed during the trial suing on the contract of exchange. Their whole theory was that as they had paid money to Fitzgerald to pay the taxes of 1906, and he had agreed to pay them by a certain time, they were entitled to recover damages for the breach of the contract. The natural measure of damages for such a breach was the money they paid him. The evidence showed clearly that after the exchange they held an encumbrance on the property from a third party (to whom in execution of the contract it was conveyed at Fitzgerald's request), which gave them the right to pay the taxes and add it to the lien secured by the mortgage trust deed; but they had no promise from Fitzgerald, express or implied, to pay the taxes of 1907, or of any subsequent year. That they afterward, entirely independently of the contract of exchange and in a negotiation which neither party had any legal reason to foresee, came into possession of this property and found it for their interest to clear off tax liens on it, gave them no legal right to recover costs and penalties, still less the taxes for a subsequent year. They are not claiming under the contract nor under the trust deed they received under it (which contained a covenant of one Johnston to pay taxes, but none of Fitzgerald), but in effect for money had and received by Fitzgerald for their use. The amount they paid, with interest, would surely be the extent of his liability.

But we are of the opinion he was not liable even for that. This view rests on considerations which involve and make it necessary for us to state further details of the transactions out of which the liability of Fitzgerald is alleged to have grown. The payment by Britten & Reynolds to Fitzgerald of the $278.65 was not an isolated and independent transaction. The exchange of properties was the consummation or execution (apparently, however, not in exact accordance with its original terms) of a written contract between Britten & Reynolds on the one hand and Fitzgerald on the

other, of the date of February 18, 1907, which provided for a variety of payments and assumptions by the respective parties. When the deeds of the properties were exchanged, and as a final result of computations which at the time of the trial neither party could recall or explain with any detail or clearness, the sum of $15,171.78 was given by Britten & Reynolds to the Chicago Title & Trust Co. for the sole or principal use and benefit of Fitzgerald. It may, for the purposes of this discussion, be treated as given to him. In making the computation which resulted in the check, it is plain from the evidence that $278.65 was allowed to Fitzgerald because the taxes due for the year 1906 on the property deeded to him in the exchange amounted to that sum. If the transcript of the record before us does not contain a clerical error in the warranty deed which Britten & Reynolds gave to Johnston, at Fitzgerald's order, however, this allowance to him of the amount of the taxes of 1906 was necessary and inevitable to make the execution of the contract conform to its terms. The contract was that Britten & Reynolds should convey by warranty deed the Washington Boulevard property to Fitzgerald, subject to "all taxes levied after the year 1906," thus undertaking in effect to hold Fitzgerald or his assignee harmless for the taxes of 1906 and prior years. But the warranty deed as it appears in the transcript of the record conveys and warrants the property only subject to all taxes levied after the year 1905. If this is correct, then to carry out the spirit and meaning of the contract, it was necessary for the grantors, Britten & Reynolds, to allow Fitzgerald, in computing the amount due to him on the transaction, the amount of the taxes for 1906, and except as Britten & Reynolds were interested in the mortgage trust deed they held from Johnston, they would have no particular concern in what he did with the money thus allowed him. There seems to be doubt thrown on the accuracy of the transcript of the warranty deed, however, by the stenographic report in the transcript of a colloquy between the court and Fitzgerald while he was testifying, in which the original deed is referred to by the court as containing the words "Subject to the

taxes levied after 1906." If, however, our decision turned
on this matter, we should be compelled to accept the tran-
script of the deed as correct. It does not so turn, however,
for whether the warranty deed conveyed the property sub-
ject to the taxes of 1906, or only subject to those levied after
1906, it is on the subsequent negotiations and dealings with
this property that we base a conclusion that any liability
from Fitzgerald to Britten & Reynolds for this money, if it
existed, was cancelled or released.

We assume that the evidence shows that in December,
1908, the following condition of things existed: There had
been conveyed by Britten & Reynolds, more than a year and
a half before, to Fitzgerald's assignee, Johnston (and after-
ward by Johnston to one Mary Tuhl, an employee and rep-
resentative of Fitzgerald, the Washington Boulevard prop-
erty. A valuable consideration had been given by Fitzgerald
for it. For purposes of his own, the deed had been made to
Johnston and not directly to himself, and an encumbrance
(the giving of which was a part of the deal), securing notes
belonging to Britten & Reynolds aggregating $16,150, was
executed, as were the notes themselves, by Johnston. The
notes in question were one for $10,000, 12 for $500 each
and one for $150, and the mortgage trust deed securing them
was a first lien on the property with the exception of the un-
paid taxes of 1906 and 1907. Of these notes of Johnston,
as a part of the transaction, the one for $10,000 had been
endorsed or guaranteed by Fitzgerald, but on the others he
had no liability. In addition to this another or second en-
cumbrance had been placed on the property for $2500, pre-
sumably by Johnston at Fitzgerald's request or order. It
seemed to be controlled by Fitzgerald, as the event showed.
Fitzgerald had been collecting the rents, but he had not paid,
nor had there been paid for him, or by Johnston or his as-
signee, Tuhl, any interest or taxes. There had been included
in the computation and check which Fitzgerald had received,
$278.65, allowed to him for the taxes of 1906 on the prop-
erty, and he had told Britten several times between the time
of conveyance to Johnston and December, 1908, that he

would pay those taxes of 1906 when "he got a little money ahead." Britten & Reynolds' interest at that time in having these taxes paid was entirely from their owning, controlling, or (if they had parted with them) being liable on the notes for $16,150, secured by Johnston's mortgage trust deed. They were in December, 1908, entirely cognizant of the fact that no taxes and no portion of the mortgage encumbrances, principal or interest, had been paid by Fitzgerald, Johnston, Tuhl, or any one else, and that a second encumbrance of $2500 had been placed on the property by Fitzgerald's order or procurement. They had, through Mr. Britten, in the early part of December, 1908, reproached Fitzgerald with these things and complained of them and, in the language of Mr. Britten in his testimony, "told Fitzgerald that some settlement had to be made on account of the $16,-150 first mortgage we held."

The exact nature of the settlement that was made between Britten & Reynolds and Fitzgerald, on or about the 29th day of December, 1908, is the real subject of dispute in this suit. These are things that were actually done: On the one side Britten & Reynolds produced the $10,000 note endorsed by Fitzgerald and cancelled it. They also produced and cancelled six of the $500 notes, leaving $3150 of the first mortgage notes signed by Johnston uncancelled. (These notes had been sold by Britten & Reynolds and were not in their possession). On the other side, Fitzgerald procured a release of the $2500 second mortgage on the property and *a quit-claim deed* from Mary C. Tuhl (who had become Mrs. Mary C. Owens) of it to Peter F. Reynolds and Frederick A. Britten.

We think that if there were no direct testimony of the parties nor other evidence as to what this settlement included, there would be no doubt in any mind that the quit claim deed of the property, carrying it, as it did, subject to all existing liens, was received in full settlement of all the claims which Britten & Reynolds had against Fitzgerald in connection with the property involved. It was to all appearance a

completion,—"a cleaning up"—of the transaction involving Fitzgerald's express or implied liability.

But there is testimony on the subject by the respective parties. Fitzgerald says that Britten opened in December, 1908, a negotiation concerning the unpaid interest on the $16,150 mortgage held by his firm. "He stated," says Fitzgerald, "that he knew that no taxes had been paid on the property and no interest had been paid, and that he might be willing to accept a quit claim deed from me and assume these various liabilities if I would release the second mortgage, which was of record, amounting to $2500. I thereupon stated to Mr. Britten that if he would save all parties holding title, including the holder of the property under the warranty deed  * * *  and also myself from any and all liability—particularly myself—he would take the property in the condition it was then in, subject to all the taxes that had not been paid, that I would give him a quit claim deed and release this second mortgage.  * * *  He accepted it" (the proposition). "He stated that some of the notes" (secured by the $16,150 mortgage) "* * *  were out with various parties.  * * *  He could not secure them all, but would produce the $10,000 note," (the one endorsed by Fitzgerald) "and a few other of the notes for cancellation."

It is to be noted that this programme was exactly carried out.

Britten's testimony on the matter of the negotiation and settlement in question is that it originated, as Fitzgerald says, in his complaint of the nonpayment of interest and taxes on the property, but that Fitzgerald proposed the quit claim, saying: "I am only interested in the $10,000 note of Johnston's, which I endorsed and which applies on that property. If you will cancel that $10,000 and release me on that note, I will give you a quit claim to the property" to which he (Britten) replied, "All right, make out your quit claim. I will have the $10,000 note cancelled." Then Britten adds: "He had his quit claim made out and I called at his office" (December 29th) "and got the quit claim and with him went to the Title & Trust Company to have his paper

cancelled." "He asked no consideration other than the cancellation of that note nor in addition to it." "Nothing was said about the taxes at the time the quit claim was given." "The taxes were mentioned—their not being paid—when I commenced the negotiation leading up to the giving of the quit claim deed." "He never stated to me that I was to take the property subject to all unpaid taxes." "The sole consideration was the cancellation and payment of the $10,000 note." "On the 29th of December when I got the quit claim and the $2500 was released, nothing was said about taxes." "When I called on Fitzgerald in the early part of December in the first negotiation which led up to the giving of the quit claim deed, I believe I said he had never paid a penny in taxes or interest on that property."

Whichever of these versions of the negotiation is correct (and that of Fitzgerald, in the light of what was actually done, seems the more likely to be accurate), we think the negotiation and settlement implied that Britten, in taking the property by quit claim, subject to those liens on it, for the release of which he did not expressly stipulate, made a settlement of the transactions and defaults, so far as Fitzgerald was concerned, which resulted in said liens,—in other words, so far as the contention in this case is concerned, a settlement of any liability of Fitzgerald for the money which had been allowed him in April, 1907, to pay the taxes of 1906.

Our conclusion therefore compels us to reverse the judgment of the Municipal Court and to enter here a judgment of *nil capiat* and for costs against the plaintiff, and it is so ordered.

*Reversed and judgment here.*